IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| INTERNATIONAL FIDELITY INSURANCE COMPANY, a New Jersey corporation,<br><br>Plaintiff,<br><br>v.<br><br>LA PORTE CONSTRUCTION, INC., et al.,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING THE AMBERLEY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; GRANTING THE JOINING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; GRANTING BARCELONA'S MOTION FOR SUMMARY JUDGMENT; AND DENYING FIDELITY'S WRITTEN RULE 56(D) MOTION**<br><br>Case No. 2:16-cv-00032<br><br>District Judge Jill N. Parrish |

## INTRODUCTION

Plaintiff International Fidelity Insurance Company ("Fidelity") filed a Complaint for Indemnity, Specific Performance, and Quia Timet Relief. Fidelity's claims arise from an Agreement of Indemnity (the "Indemnity Agreement") under which Fidelity issued performance and payments bonds to Defendant La Porte Construction, Inc. ("La Porte") in connection with La Porte's construction of a high-density mixed-use residential and commercial project known as The Plaza at State Street in Salt Lake City, Utah (the "Plaza Development").

Defendants Amberley Properties I, LLC, Amberley Properties II, LLC, Bracken Properties, L.L.C., Dundee Properties, L.L.C., Edinburgh Properties, L.L.C., Farquhar Properties, L.L.C., Glenfinnan Properties, L.L.C., and Inverness Properties, L.L.C. (the "Amberley Defendants") filed a Motion to Dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) (alternatively to be treated as a motion for summary judgment) (the "Motion"). (Dkt. 15). The Amberley Defendants contend that Fidelity cannot state a claim under the Indemnity Agreement because the individual who signed it, Benjamin Logue, was not

authorized to sign it on their behalf. Defendants Andalucia Properties, L.L.C., Jameson Commercial Properties, L.L.C., Jameson Properties, L.L.C., Kilmarnock Properties, L.L.C., McGregor Properties, L.L.C., Oban Properties, L.L.C., Portree Properties, L.L.C., and Raasay Properties, L.L.C. (the "Joining Defendants" and together with the Amberley Defendants, the "Movants") filed a Notice of Joining in Co-Defendants' Motion to Dismiss (the "Joinder"). (Dkt. 27). The Joining Defendants similarly argue that Mr. Logue, who likewise signed the Indemnity Agreement purportedly on behalf of the Joining Defendants, did not have authority to sign on their behalf.

The court held a hearing on the Movants' motions on October 17, 2016. At the hearing, Fidelity made a speaking motion pursuant to Fed. R. Civ. P. 56(d)[1] for discovery.[2] Specifically, Fidelity requested that it be granted opportunity to depose Mr. Logue regarding certain representations contained in the Indemnity Agreement and Resolutions, and his authorization to sign the Indemnity Agreement. The court granted Fidelity's oral Rule 56(d) motion, but limited discovery to Mr. Logue's testimony regarding his authority to sign the Indemnity Agreement and the Resolutions on behalf of the Movants. Because Mr. Logue was present with his attorney at the hearing, the court determined that it would be most convenient and cost-effective to allow Fidelity to examine Mr. Logue at the hearing. Acting pursuant to the discretion granted to it under Fed. R. Civ. P. 56(d)(3), the court, over Fidelity's objection, ordered the examination of Mr. Logue at the hearing. At the conclusion of Mr. Logue's examination, the court inquired

_____

[1] In addition to its speaking Rule 56(d) motion, Fidelity later filed a written Rule 56(d) motion asking the court to defer ruling on the summary judgment motions pending further discovery. (Dkt. 56).

[2] At the outset of the hearing, the court recognized that the parties had all submitted evidence that was not filed with the complaint and that none of the parties objected to treating the motions as motions for summary judgment. The parties thereafter treated the motions as motions for summary judgment.

whether the parties desired to submit supplemental briefing for the court's consideration. Fidelity requested that it be allowed to submit a supplemental memorandum. The court ordered Fidelity to submit its supplemental memorandum within seven days and ordered the Movants to submit their response, if any, within five days thereafter.[3]

      A week after the hearing, Defendant Barcelona Properties, LLC ("Barcelona"), whose counsel had been present at the October 17 hearing, filed a Notice of Joining in Co-Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (the "Barcelona Motion") (Dkt. 35). Because of the similarity of issues presented and the prior briefing on many of the issues, as well as the hearing held on the previous motions, the court finds that oral argument on the Barcelona Motion would not further assist the court in its decision and will rule on Barcelona's motion on the basis of the written memoranda. *See* DUCivR 7-1(f).

      Because evidence outside the pleadings was presented by the parties and will not be excluded by the court, the Movant's motions and the Barcelona Motion must be treated as motions for summary judgment under Fed. R. Civ. P. 56. *See* Fed. R. Civ. P. 12(d). Indeed, none of the parties objected to treating the motions as motions for summary judgment when the court indicated at the outset of the October 17 hearing that it was inclined to treat them as such. After considering all of the parties' written submissions, the oral arguments, and the evidence before it, the court issues this Memorandum Decision and Order Granting the Amberley Defendants' Motion for Summary Judgment; Granting the Joining Defendants' Motion for Summary

---

[3] The Amberley Defendants submitted their supplemental memorandum and attached the Declaration of David A. Salzman. (Dkt. 40). Fidelity filed evidentiary objections to that Declaration (Dkt. 47), objecting to certain statements made in the Declaration on the grounds that they lack foundation, state legal conclusions, are inconsistent with the evidence, and/or are speculative. Having considered the objections, the court OVERRULES Fidelity's Evidentiary Objections to the Declaration of David A. Salzman.

Judgment; Granting Barcelona's Motion for Summary Judgment; and Denying Fidelity's written

Rule 56(d) Motion.

## FACTUAL BACKGROUND

### I.      The Indemnity Agreement

This case arises out of the development and construction of a high-density mixed-use

residential and commercial project in downtown Salt Lake City known as the Plaza at State

Street. Defendant La Porte was hired as the general contractor for the Plaza Development. At all

times relevant to this case, La Porte conducted its business through its principal, Mr. Benjamin

Logue. In connection with an application to Fidelity for contractor performance and payment

bonds, Mr. J. David Wittwer, a representative of Fidelity, presented Mr. Logue with the

Indemnity Agreement and asked him to execute and deliver it to Fidelity. The Indemnity

Agreement listed all named defendants in this action—including the Movants and Barcelona—as

"Indemnitors," and named International Fidelity Insurance Company and/or Allegheny Casualty

Company as "Surety."

The Indemnity Agreement required all those listed as Indemnitors to indemnify Fidelity

"against all losses, costs, expenses, and exposure" related to its bonds and the construction of the

Plaza Development by La Porte. The Indemnity Agreement also contained the following

provision under the heading "Representations":

> The undersigned represent to [Fidelity] that they have carefully read the entire
> [Indemnity] Agreement and that there are no other agreements or understandings
> which in any way lessen or modify the obligations set forth herein. The
> undersigned further warrant and represent to [Fidelity] that all necessary action
> has been taken by them to authorize the execution and delivery of this
> [Indemnity] Agreement.

The Indemnity Agreement was executed on March 30, 2012 on behalf of each of the Movants

and Barcelona by Mr. Logue, who signed as the Managing Member of each of the Movants and

Barcelona. Accompanying each signature is an Acknowledgment by a notary public that Mr.

Logue signed on behalf of each of the Movants and Barcelona.

## II.     The Resolutions

Along with the Indemnity Agreement, Mr. Wittwer also presented Mr. Logue with

Resolutions Authorizing Execution of Indemnity Agreement (the "Resolutions" or individually

"Resolution") that corresponded to each of the Movants and Barcelona. The Resolutions, which

were prepared by Fidelity, each contained the following provisions:

> At a Special meeting of the Members of the [e.g., Amberley Properties II, LLC]
> . . . duly called and held on the 30 day of March, 2012 a quorum being present,
> the following Preamble and Resolution were adopted: WHEREAS this LLC has a
> financial material and beneficial interest in transactions in which LaPorte
> Contruction, Inc. [is involved] . . . RESOLVED, that the Managing Member(s)
> authorized to execute documents on behalf of the LLC, be and they are hereby
> authorized and empowered to execute any indemnity agreement or agreements
> required by [Fidelity] . . . RESOLVED FURTHER, that the Member be and they
> are hereby authorized and empowered to execute such indemnity agreement or
> agreements and to any and all amendments to said indemnity agreement or
> agreements and to any other or further agreements.

The Resolutions each concluded with a provision intended to identify by name the "Managing

Members" authorized to execute the Indemnity Agreement on behalf of each of the Movants and

Barcelona, but no names or entities were listed. Each of the Resolutions bears the sole signature

of "Benjamin Logue, Managing Member."

Although the Resolutions state that they were adopted in a "Special meeting of the

Members" of each of the Movants and Barcelona, no such meetings actually took place.

## III.    The Movants

Each of the Movants is a single purpose Utah limited liability company. Each of the

Movants was individually formed for a specific purpose, i.e., to invest in, develop, and maintain

its own specific real estate "Project." By way of example, Amberley Properties II, LLC's

Operating Agreement defined its "Project" as "the property . . . in Ogden, Utah and the 32-unit

multifamily rental housing development and other improvements to be rehabilitated, owned and operated thereon by the Company, and to be known as Fairview Apartments." None of the Movants' "Projects" are in any way related to the Plaza Development. Further, none of the Movants have any financial, material or beneficial interest in the Plaza Development. The only connection between the Movants and the Plaza Development is that the Plaza Development's contractor, La Porte, had also acted as the contractor in constructing or renovating the various "Projects" owned by the Movants.[4]

With the exception of Andalucia Properties, L.L.C. ("Andalucia"), Mr. Logue was not the Managing Member of any of the Movants. The Movants' Operating Agreements, except for that of Andalucia, are identical for purposes of this matter. Each provides that the membership of each Movant consists of two members: an Investor Member (who in every case was an institutional investor and not Mr. Logue) and a Managing Member.[5] Although Mr. Logue signed the Indemnity Agreement as the "Managing Member" of each of the Movants, he was not the Managing Member of any of them. Rather, each of the Movants' Operating Agreements (except for Andalucia's) identifies the Managing Member as a Managing LLC.[6]

Andalucia differs from the other Movants because Andalucia was set up to be manager managed and had no Investor Member and no Managing Member. Rather, the Andalucia Operating Agreement identifies Benjamin Logue and Lisa Logue as its Members—Mr. Logue

---

[4] For example, La Porte previously did construction work on Amberley Properties II, LLC's "Project," the Fairview Apartments.

[5] The Investor Member of each of the Amberley Defendants owned a 99.99% membership interest and the Managing Member owned a .01% membership interest. The Investor Member of each of the Joining Defendants (except for Andalucia) owned a 99.9% membership interest and the Managing Member owned a .1% membership interest.

[6] For example, the Managing Member of Amberley Properties II, L.L.C., was Amberley Properties II, Managing Member, L.L.C., a Utah limited liability company. Each of the Moving Defendants, with the exception of Andalucia, similarly had a "Managing LLC" as its Managing Member. The manager of each Managing LLC was Benjamin Logue.

owning a 51% membership interest and Lisa Logue owning a 49% membership interest—and Benjamin Logue as its Manager.[7] Like the other Movants, Andalucia was created to accomplish a single delineated purpose. Andalucia was "formed for the purposes of owning, developing, and managing real property in Price City, Utah and other activities directly related to that property." Like the other Movants, Andalucia has no financial, material or beneficial interest in the Plaza Development and its only connection to the Plaza Development is its hiring of La Porte for the development of its real property in Price City, Utah.

None of the Movants ever authorized Mr. Logue to sign the Indemnity Agreement or the Resolutions on their behalf. Rather, Mr. Logue testified that Fidelity's representative presented him with the Indemnity Agreement and Resolutions and asked him to sign them. Although Mr. Logue purported to execute the Indemnity Agreement and Resolutions on behalf of the Movants, he was not authorized to do so and had believed that he was pledging only his own individual ownership interest—an interest in the Managing LLCs which each owned only a .01% or .1% interest in the Movants.

## IV.   Barcelona

Unlike the Movants, Barcelona was set up as a sole-member LLC, the sole member being Benjamin Logue. Barcelona was organized as a manager-managed LLC with Benjamin Logue identified as the company's Manager. At the time the Indemnity Agreement was signed, Mr. Logue served as both the sole member and Manager of Barcelona. Barcelona's Operating Agreement provided that Barcelona was formed for the purpose of "engag[ing] in the business of owning, operating, managing[,] developing and selling real property, and to conduct such other business as is designated by [its] Manager." The Barcelona Operating Agreement also provided

---

[7] The manager of Andalucia was subsequently changed to a Managing LLC (Andalucia Management Group, LLC) in May 2012. Nevertheless, it remains undisputed that Mr. Logue was Andalucia's Manager at the time the Resolutions and Indemnity Agreement were executed.

that "management of [Barcelona] is vested exclusively in the Manager. No Member, acting solely in its capacity as a Member, may be an agent of [Barcelona], nor may any Member, in that capacity, bind or execute any instrument on behalf of [Barcelona] without the prior written consent of the Manager." Like the Movants, Barcelona has no financial, material or beneficial interest in the Plaza Development.

## V.     Demand Made on the Bonds

Due to difficulties in completing the Plaza Development, the construction lender for the project served La Porte with a Notice of Default and Termination, and made demand on the bonds issued by Fidelity. Fidelity brought this action to enforce its rights under the Indemnity Agreement.

## LEGAL STANDARD

Although the Movants and Barcelona characterize their motions as motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Movants and Barcelona have attached affidavits and the Operating Agreements for the court's consideration. Fidelity also attached affidavits to its memoranda in opposition to these motions. In ruling on a Rule 12(b)(6) motion, the court is limited to considering the contents of the complaint. *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013).[8] Under Fed. R. Civ. P. 12(d), if "matters outside the

---

[8] Exceptions to this general rule include "documents incorporated by reference in the complaint; documents referred to in and central to the complaint, when no party disputes its authenticity; and 'matters of which a court may take judicial notice.' " *Berneike*, 708 F.3d at 1146 (quoting *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010)). In addition, "if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim," either party "may submit an indisputably authentic copy to the court to be considered" in their motion to dismiss filings. *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384–85 (10th Cir. 1997) (holding that a district court properly considered a letter that was "frequently referred to and quoted from" in the plaintiff's complaint). *But cf. Berneike*, 708 F.3d at 1146 (holding that a district court improperly considered a letter in a 12(b)(6) motion because the letter was not mentioned or incorporated into the plaintiff's complaint by reference). While the court may take judicial notice of the operating

pleadings are presented to and not excluded by the court, the motion must be treated as one for

summary judgment." Therefore, the court can convert the motions to dismiss into motions for

summary judgment, or the court can treat the motions under Rule 12(b)(6), considering only the

complaint and related documents. *See Ordonez v. Canyons Sch. Dist.*, No. 2:13-CV-245-DAK-

EJF, 2016 WL 5415663, at *2 (D. Utah Sept. 28, 2016) ("The court may simply disregard the

exhibits filed and rule on the motion to dismiss based solely on the pleadings."); *PayoutOne v.*

*Coral Mortg. Bankers*, 602 F. Supp. 2d 1219, 1227 (D. Colo. 2009) ("There is no requirement,

however, that a court automatically convert a motion to dismiss to a motion for summary

judgment simply because one or both parties file documents in connection with a motion to

dismiss.").

Because evidence outside the pleadings has been presented by the parties and will not be

excluded by the court, the motions will be treated as motions for summary judgment under Fed.

R. Civ. P. 56. *See* Fed. R. Civ. P. 12(d). None of the parties object to converting the motions to

motions for summary judgment under Fed. R. Civ. P. 12(d). When a 12(b)(6) motion is treated as

one for summary judgment under Rule 56, "[a]ll parties must be given a reasonable opportunity

to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). In their motion,

the Amberley Defendants stated that they do not object to the motion being converted into a

motion for summary judgment. Likewise, the Joining Defendants do not object and urge the

court to either dismiss the claims against them or to alternatively grant summary judgment in

their favor. Barcelona also stated in its motion that it does not object to considering the motions

under Rule 56. In responding to the motions, Fidelity treated the motions to dismiss as motions

for summary judgment and conformed its responses to the requirements of DUCivR 56-1. The

agreements and related documents attached by the Moving Defendants as documents in the
public record, the other attached documents and the evidence presented at the hearing constitute
matters outside of the pleadings.

court also indicated at the outset of the hearing that it was inclined to treat the motions as motions for summary judgment, granted Fidelity's oral motion for discovery under Fed. R. Civ. P. 56(d), and then allowed the parties to file supplemental memoranda following the hearing. Therefore, all parties have been given a reasonable opportunity to present all the material pertinent to the motions.

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). The court views the facts in the light most favorable to the nonmovant, and also draws all reasonable factual inferences in the nonmovant's favor. *Tabor v. Hilti, Inc.*, 73 F.3d 1206, 1215 (10th Cir. 2013).

## ANALYSIS

### I.    Fidelity's Written Rule 56(d) Motion

Fidelity has moved the court in writing (supplementing the oral motion for additional discovery that it made at the October 17 hearing) for an order under Fed. R. Civ. P. 56(d) deferring decision on the Motion, the Joinder, and the Barcelona Motion and allowing it time to conduct additional discovery. Specifically, Fidelity seeks the following discovery:

> 1. [A] subpoena to The Buckner Company ("Buckner"), the insurance agency of La Porte Construction, Inc., for Buckner's documents, including emails, regarding the bonds for [the Plaza Development] and the ["Projects"] of Movants;

2. [T]he depositions of David Wittwer and other Buckner agents or staff, as disclosed by the Buckner documents, who were involved in providing bonds for the [Plaza Development] and the Movants' ["Projects"];

3. [T]he deposition of Mr. Logue regarding the facts disclosed by the Buckner documents, the basis for allegations in the Amended Answer of the Logue Defendants that he was authorized to sign the Indemnity Agreement for [only Defendants La Porte Construction, Inc., Benjamin Logue, and La Porte Management, Inc. but not authorized for any of the other Defendants], and his testimony at the hearing on the Motion and Joinder held on October 17, 2016 ("Hearing"); and

4. [S]uch other discovery, including document requests, subpoenas, and depositions, as may be appropriate in light of facts disclosed by the discovery described above.

When considering a Rule 56(d) motion, a court will not grant additional time for discovery if the movant "has been dilatory, or the information sought is either irrelevant to the summary judgment motion or merely cumulative." *Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550, 1554 (10th Cir. 1993) (citation omitted).

The court already granted Fidelity's oral motion under Fed. R. Civ. P. 56(d), allowing it to examine Mr. Logue at the hearing on the motions to dismiss. The court finds that the additional proposed discovery identified by Fidelity in its written Rule 56(d) motion would be either cumulative or irrelevant to the disposition of these motions. As discussed below, these motions turn on whether Mr. Logue had actual authority to act on behalf of the Movants and Barcelona in executing the Resolutions and Indemnity Agreement. But Fidelity's requested discovery does not relate directly to this question. And to the extent it does, it would be merely cumulative in light of the testimony elicited from Mr. Logue as a result of the court's granting of Fidelity's oral Rule 56(d) motion. The court accordingly DENIES Fidelity's written Rule 56(d) motion.[9]

---

[9] Because oral argument on this motion would not further assist the court in its decision, the court rules on the basis of the written memoranda. *See* DUCivR 7-1(f).

II.    **The Summary Judgment Motions**

The court will first address the Movants' motions and will then address the Barcelona

Motion.

Movants' arguments center on Mr. Logue's lack of authority to execute the Indemnity

Agreement. Movants argue that Mr. Logue had neither actual nor apparent authority to sign on

behalf of each of them because he was not their Managing Member; and even if he were, his

execution of the Agreement was ultra vires because it exceeded the scope of the authority given

to the Managing Member in the various operating agreements. Fidelity responds that Mr. Logue

had actual authority pursuant to the Resolutions executed by Mr. Logue on behalf of the

Movants. Fidelity argues that it relied on the representations in the Resolutions and the

Indemnity Agreement and that those representations are evidence that Mr. Logue acted with

express actual authority when he executed the Indemnity Agreement. Fidelity also makes an

apparent authority argument.[10]

It is well settled law that "an agent cannot make its principal responsible for the agent's

actions unless the agent is acting pursuant to either actual or apparent authority." *Zions First

Nat'l Bank v. Clark Clinic Corp.*, 762 P.2d 1090, 1094 (Utah 1988) (citations omitted). "The

burden of proof as to [an agent's] authority is on the party seeking to enforce the transaction."

*Luddington v. Bodenvest Ltd.*, 855 P.2d 204, 207 (Utah 1993). It therefore falls on Fidelity to

show that Mr. Logue had either actual or apparent authority to execute the Indemnity Agreement

---

[10] Fidelity indicated in its written memoranda and at the October 17 hearing that apparent authority was not at issue in this case. However, in its supplemental memorandum submitted to the court after the October 17 hearing, Fidelity raised for the first time an apparent authority argument. As discussed below, even if the court considers the apparent authority argument, the undisputed evidence is that Mr. Logue had no apparent authority to sign the Indemnity Agreement.

on behalf of the Movants. For the reasons stated below, Mr. Logue lacked authority as a matter of law to execute the Indemnity Agreement on behalf of each of the Movants.

A.     Mr. Logue Lacked Actual Authority to Sign the Indemnity Agreement on Behalf Each of the Movants

Actual authority can be either express or implied. As there is no argument that Mr. Logue acted with implied actual authority, the court confines its analysis to express actual authority. "Express authority exists whenever the principal directly states that its agent has the authority to perform a particular act on the principal's behalf." *Luddington*, 855 P.2d at 1094–95 (citations omitted). Express actual authority is found where the principal makes it clear, orally or in writing, "that the act under scrutiny is to be done." 2A C.J.S. *Agency* § 147 (2016). An agent with express actual authority "is one who is *in fact authorized* by the principal to act on the principal's behalf." *Id.* (emphasis added). Accordingly, the analysis of express actual authority focuses exclusively on the relationship between the principal and the agent as it actually existed, not the relationship as viewed or understood by contracting third parties.

1)     Mr. Logue was not the Managing Member of any of the Movants except Andalucia and was not authorized to execute the Indemnity Agreement on behalf of the Movants

By their express terms, the Movants' Operating Agreements do not give Mr. Logue express actual authority to execute the Indemnity Agreement on behalf of any of the Movants.[11] Under the terms of the Operating Agreements, only the Managing Member was authorized to execute a document like the Indemnity Agreement on behalf of any of the Movants. It is undisputed that the Managing Member of each of the Movants was a Managing LLC and that Mr. Logue was not the Managing Member of any of the Movants.

---

[11] "Movants" in this subsection refers to all Movants with the exception of Andalucia.

Fidelity argues that it relied on the representations of authority in the Resolutions and the Indemnity Agreement as evidence of Mr. Logue's express actual authority. (*See, e.g.*, Dkt. 20, pp. 4–5, 7–8, 12; Dkt. 28, pp. 15, 17, 20). But reliance on documents or representations, whether made by the agent or the principal, cannot give rise to express actual authority. Express actual authority can be given only by the principal, and it must be communicated by the principal to the agent. *See* 2A C.J.S. *Agency* § 147 (2016); *Zions First Nat'l Bank*, 762 P.2d at 1094–95. No representations, documentation, or assurances given by Mr. Logue to Fidelity can create express actual authority. *Burdick v. Horner Townsend & Kent, Inc.*, 345 P.3d 531, 539 (Utah 2015) ("An agent's success in misleading the third party as to the existence of actual authority does not in itself make the principal accountable." (*quoting* Restatement (Third) of Agency § 2.03 cmt. c (2006))).

Fidelity also argues that the Resolutions executed by Mr. Logue gave him actual authority to execute the Indemnity Agreement. Although it is typical for business entities to grant express actual authority (including authority to do something in contravention of the entity's operating agreement) to agents in resolutions, those resolutions must be executed with the proper formalities to validly confer such authority. S*ee* Utah Code § 48-2c-803(2)(c)[12] (requiring "the affirmative vote, approval, or consent of all members [to] authorize a member or any other person to do any act on behalf of the company that contravenes the articles of organization or operating agreement" in a member-managed LLC); *id.* § 48-2c-804(6)(g) (requiring approval by "all of the members and all of the managers . . . for matters described in Subsection 48-2c-803(2)" in a manager-managed LLC). Improperly executed resolutions can give no more authority than forged resolutions.

---

[12] All sections of the Utah Code cited herein are from the now-repealed Utah Revised Limited Liability Act (the "Act"). The Act was in effect at all times pertinent to this dispute.

14

Here, the Resolutions conveyed no authority for Mr. Logue to execute the Indemnity Agreement. Although they purport to give the "Managing Member(s)" authority to execute documents on behalf of each of the Movants, including "any indemnity agreement or agreements required by [Fidelity]," they were signed only by Mr. Logue himself.[13] Because Mr. Logue was neither a Member nor a Manager, his signature on the Resolutions was wholly ineffective and incapable of conveying any authority to execute the Indemnity Agreement.[14] Furthermore, although the Resolutions state that they were adopted pursuant to a special meeting of the "Members" of each of the Movants, Mr. Logue testified that no such special meeting ever took place.[15] In fact, the Resolutions were prepared by Fidelity and presented to Mr. Logue for his signature "in a hurry."

It is clear that Fidelity prepared the Indemnity Agreement and Resolutions without any semblance of due diligence to verify who was required to sign such documents on behalf of the Movants. Indeed, Fidelity's Regional Manager in charge of approving contract bonds testified that Fidelity was unaware that Movants had a Managing Member who was not Mr. Logue and did not even know that Movants had operating agreements. But Utah law is clear that a third party like Fidelity that "deals exclusively with an agent [like Mr. Logue] has the responsibility to

---

[13] "Members" are defined in each of the Movants' Operating Agreements as the Managing Member and the Investor Member. It is undisputed that Benjamin Logue was neither the Managing Member nor the Investor Member of any of the Movants.

[14] And even if the Resolutions were properly executed, the Resolutions only authorized the "Managing Member(s)" to sign the Indemnity Agreement and the fact remains that no Managing Member ever signed the Indemnity Agreement.

[15] Fidelity tries to manufacture a dispute of fact over the credibility of Mr. Logue's testimony because it directly contradicts the representations made in the Indemnity Agreement and the Resolutions. However, it is undisputed that both the Indemnity Agreement and the Resolutions were drafted by Fidelity and delivered to Mr. Logue for his signature, that Mr. Logue did not read any of the documents, and that Mr. Logue signed the documents "in a hurry at that time." These facts are consistent with the conclusion that Mr. Logue had no actual authority to sign them.

ascertain that agent's authority despite the *agent's* representations." *City Elec. v. Dean Evans Chrysler-Plymouth*, 672 P.2d 89, 90 (Utah 1983) (emphasis added).

The Resolutions that Mr. Logue signed and the representations made therein are, at most, a purported agent's representations of his own authority. But the law does not allow a purported agent to create his own authority by signing resolutions professing to give him authority never conferred by his principal. Fidelity, a sophisticated surety that enters into contracts like the Indemnity Agreement on a routine basis, had an obligation to request and examine the Movants' Operating Agreements to ascertain whether Mr. Logue had the authority to execute the documents prepared and presented by Fidelity. This is basic due diligence. A review of the Movants' Operating Agreements would have made it clear that Mr. Logue was not authorized to adopt the Resolutions and that he lacked the authority to enter into the Indemnity Agreement on behalf of the Movants.

Fidelity next argues that because Mr. Logue was the manager of each of the Movants' respective Managing Members (the Managing LLCs), no person other than Mr. Logue could have signed the Indemnity Agreement on behalf of the Movants. In essence, Fidelity argues that the court should overlook the fact Mr. Logue did not execute the Indemnity Agreement in his capacity as manager of the managing member of each of the Movants. By way of example, Fidelity asserts that it would elevate form over substance to say that, for example, Raasay Properties, L.L.C. is not bound by the Indemnity Agreement because Mr. Logue did not sign as "Benjamin Logue, Manager of Raasay Management Group, L.L.C., Managing Member of Raasay Properties, L.L.C."

Fidelity is mistaken in its assertion that no person other than Mr. Logue could have signed the Indemnity Agreement on behalf of the Movants. Under the terms of the Movants' Operating Agreements, the only person or entity authorized to execute documents on behalf of

the Movants was each Movant's Managing LLC. Although it is true that Mr. Logue, as the manager of each respective Managing LLC, was the only person who could have signed on behalf of each of the Managing Members of the Movants, that does not change the fact that Mr. Logue did not sign in that capacity. Nor does this fact excuse the absence of the requisite formalities in this case. The formalities required to create a business entity and the formalities required for such an entity to transact business exist as a protection for people conducting business and must be strictly followed.[16] In the world of business entities and organizations, form is the *sine qua non*. The Indemnity Agreement fails to even mention any of the Managing LLCs and by no stretch of the imagination can those managing entities be said to have executed it. The required formalities were completely absent in this case and Fidelity cannot now ask the court to ignore its failure in this regard.

It is also significant that each of the Movants was a single purpose entity that was formed to construct or renovate, and then maintain, certain properties. The beneficial owners of the Movants had absolutely no financial interest in the Plaza Development or any motivation to execute the Indemnity Agreement. Further, Mr. Logue had no significant financial interest in the Movants at the time the Indemnity Agreement was signed. He held an interest only in the Managing LLCs, each of which held a *de minimis* membership interest in the Movants. It is true that Movants had each hired La Porte as a contractor on their individual projects at some point in the past, but those past relationships with La Porte on unrelated projects does not give them an interest in the Plaza Development. Thus, there would have been no reason for Movants to have authorized Mr. Logue to execute the Indemnity Agreement.

---

[16] Had these formalities been followed, it likely would have made a material difference in this case because Mr. Logue wouldn't have mistakenly believed he was pledging only his own individual ownership interest when he executed the Indemnity Agreement.

Finally, Fidelity argues that the Indemnity Agreement and Resolutions bind the Movants

under the now-repealed Utah Revised Limited Liability Company Act ("Utah LLC Act").[17]

Fidelity argues that two provisions of the Utah LLC Act apply in this case. The first states:

> [I]n a manager-managed company . . . an act of a manager, including the signing
> of a document in the company name for apparently carrying on in the ordinary
> course of the company business, or business of the kind carried on by the
> company, binds the company unless the manager had no authority to act for the
> company in the particular matter and the lack of authority was expressly described
> in the articles of organization or the person with whom the manager was dealing
> knew or otherwise had notice that the manager lacked authority.

Utah Code § 48-2c-802(2)(c). Fidelity argues that because "section 802 sets forth the

circumstances in which authority to act on behalf of an LLC is presumed under the Act," *Zions*

*Gate R.V. Resort v. Oliphant*, 326 P.3d 118, 122 (Utah Ct. App. 2014), Mr. Logue should be

presumed to have acted with authority under section 802(2)(c). But Fidelity ignores the

undisputed fact that Mr. Logue was not the manager of any of the Movants. At the time the

Indemnity Agreement and Resolutions were signed, the manager of each Movant was its

respective Managing LLC.

The second provision of the Utah LLC Act on which Fidelity relies provides that:

> in a manager-managed company . . . an act of a manager which is not apparently
> for carrying on in the ordinary course of the company business, or business of the
> kind carried on by the company, binds the company only if the act was authorized
> by the members in accordance with Subsection 48-2c-803(2) or (3).

Utah Code § 48-2c-802(2)(d). The court fails to see how this provision helps Fidelity.

Under no stretch of the imagination can guaranteeing bonds for a wholly unrelated

development project such as the Plaza Development be considered within the ordinary

course of business for single-purpose entities like the Movants.  And, as previously

discussed *supra*, Mr. Logue was not a manager of any of the Movants, nor was he

---

[17] *See supra*, n.12.

authorized by the members of the Movants in accordance with Subsections 803(2) or (3) as required by this provision.[18]

> 2)      Mr. Logue was the Manager of Andalucia Properties, LLC, but
>          Nevertheless Lacked Express Actual Authority to Execute the
>          Indemnification Agreement on Behalf of Andalucia

It is undisputed that Mr. Logue was the manager of Andalucia Properties, LLC, a manager-managed LLC. As Andalucia's manager, Mr. Logue was authorized to take certain actions on Andalucia's behalf. Andalucia argues that although Mr. Logue was the manager of Andalucia when the Resolution and Indemnity Agreement were executed, Mr. Logue lacked actual authority to enter into the Indemnity Agreement because it clearly conflicted with Andalucia's sole stated purpose.

Because Andalucia was a manager-managed LLC and its Manager was Benjamin Logue, it is undisputed that Andalucia has no "Managing Member.[19]" Yet, both the Indemnity Agreement and the Andalucia Resolution were signed by Mr. Logue as the "Managing Member" of Andalucia and not its Manager. But even were the court to ignore this failure to follow the appropriate formalities and view this error as a mere clerical error (which is a stretch given the complete absence of due diligence on the part of Fidelity), the court concludes that Mr. Logue, as Andalucia's manager, lacked the authority to bind Andalucia to the Indemnity Agreement.

---

[18] Utah Code § 48-2c-803(3) requires "the affirmative vote, approval, or consent of members holding 2/3 of the profits interests in the company" in order to "authoriz[e] a member or any other person to do any act on behalf of the company that is not in the ordinary course of the company's business, or business of the kind carried on by the company." It remains undisputed that the members never had a meeting or otherwise approved Mr. Logue's execution of the Indemnity Agreement.

[19] Andalucia's Operating Agreement states that it is to be managed by a manager. It further states that its manager may, but does not need to be a member. Although Mr. Logue was both a member and the manager, there is no "managing member" as there would be in a member-managed LLC.

The execution of the Indemnity Agreement contradicted Andalucia's stated purpose. Like the other Movants, Andalucia was a single purpose entity. Its sole stated purpose was to own, develop, and manage a piece of real estate in Price City, Utah. The stated purpose also allowed Andalucia to engage in other activities that were directly related to that piece of property. Andalucia argues that an agreement to indemnify Fidelity for the bonds that it issued to La Porte for the Plaza Development in Salt Lake City has nothing to do with its property in Price City, Utah. The court agrees. There is no evidence that Andalucia had any interest in the Plaza Development or La Porte, or that there is any connection between the property in Price City and the Plaza Development in Salt Lake City. In short, when Mr. Logue signed the Indemnity Agreement on behalf of Andalucia as its Manager, he did so in contravention of the Andalucia Operating Agreement.

In a manager-managed LLC, resolutions can provide express actual authority, even if that authority contravenes the operating agreement. S*ee* Utah Code §§ 48-2c-804(4), 48-2c-804(6)(g) (stating that "no manager shall have authority to do any act in contravention of the articles of organization or the operating agreement" unless "all of the members and all of the managers" approve). Presumably in an effort to comply with Sections 804(4) and 804(6)(g), the Andalucia Resolution that Fidelity provided to Mr. Logue for his signature stated that it was adopted at a special meeting of the Members of Andalucia. However, Mr. Logue's undisputed testimony is that no special meeting ever took place and he never had the authorization of all of the members and managers to sign the Indemnity Agreement. Although the Andalucia Resolution was in fact signed by its Manager, that does not change the fact that the representations made in the Resolution were patently false and therefore legally deficient in granting Mr. Logue express actual authority. Absent approval by all the members of Andalucia, Mr. Logue did not have authority to do an act that contravened the operating agreement.

20

Because Mr. Logue signed the Indemnity Agreement in contravention of the stated purpose of Andalucia and without the approval of all the members and managers of Andalucia, he did not have actual authority to do so.

B.      Fidelity Waived its Apparent Authority Argument

In Fidelity's Memorandum in Opposition to the Joint Motion to Dismiss filed by the Joining Defendants, Fidelity asserted that "[a]pparent authority is not the basis of [its] claims." (Dkt. 28 at 20). Fidelity reiterated that position at the October 17 hearing when it again indicated that apparent authority was not at issue in this case. Rather, Fidelity argued only that Mr. Logue had actual authority. Despite the express abandonment of an apparent authority argument, Fidelity argued for the first time in its post-hearing supplemental memorandum that Mr. Logue was clothed with apparent authority when he signed the Indemnity Agreement. The court will not allow Fidelity to resurrect an argument that it has expressly abandoned. *See United States v. Zubia-Torres*, 550 F.3d 1202, 1205 (10th Cir. 2008) ("We typically find waiver in cases . . . where a party attempts to reassert an argument that it previously raised and abandoned below.").

But even if Fidelity had not waived its apparent authority argument, the argument is without any basis in fact. In contrast to actual authority, apparent authority is dependent upon how the agency relationship is viewed or perceived by a third party based on representations made by the principal. Apparent authority "arises in one whom the principal has intentionally or by lack of ordinary care induced third persons to believe is its agent although no authority has been conferred on him or her either expressly or by necessary implication." 2A C.J.S. *Agency* § 153 (2016). An essential element of apparent authority is for the "third party [to rely] on this appearance of authority." *Hale v. Big H Constr., Inc.*, 288 P.3d 1046, 1061 (Utah Ct. App. 2012) (*citing Luddington*, 855 P.2d at 209). "Thus, an analysis of apparent authority focuses on the acts

of the principal from a third party's perspective." *Id.* In short, "[a]pparent authority is appropriately found where the acts or conduct of the principal . . . creates an appearance which causes a third party . . . to reasonably believe that a second party . . . has authority to act on the principal's behalf." *Posner v. Equity Title Ins. Agency*, 222 P.3d 775, 781 (Utah Ct. App. 2009) (alteration in original) (citation and internal quotation marks omitted), *abrogated on other grounds by Coroles v. State*, 349 P.3d 739 (Utah 2015).

Fidelity argues that Movants caused it to believe that Mr. Logue had authority to execute the Indemnity Agreement by way of the following provisions of the Movants' Operating Agreements: (1) by designating Mr. Logue as the manager of each Managing LLC; (2) by designating the same address for each Movant, each Managing Member, and Mr. Logue as the manager of each Managing Member; (3) by granting exclusive authority to each Managing LLC to manage the Movants; and (4) by providing that the Managing LLC's decisions were binding on the Movants. Fidelity maintains that this convolution of provisions in the Operating Agreements shows that Movants created the circumstances under which Fidelity was entitled to believe that Mr. Logue, and no other person, was authorized to act on behalf of each of the Movants.

In making its apparent authority argument, Fidelity ignores the fact that it did not even consider the Operating Agreements when it prepared the Indemnity Agreement and gave it to Mr. Logue to execute. The Operating Agreements therefore cannot have been the basis for Fidelity's purported belief that Mr. Logue had authority to act on behalf of the Movants. In its memoranda in opposition to the Motion and the Joinder, Fidelity submitted the Declaration of Steven Lepere, the Regional Manager of Fidelity's contract bonds office. Mr. Lepere declared that he was unaware that Mr. Logue was not the managing member of the Movants and was unaware that they had operating agreements. Fidelity cannot now claim that it reasonably

believed Mr. Logue had authority to act on behalf of the Movants based on the contents of Operating Agreements of which it was not even aware.[20]

Fidelity's own declarant has established that the Movants' Operating Agreements were neither considered nor relied upon when Fidelity had Mr. Logue sign the Indemnity Agreement. Rather, because of its lack of due diligence, Fidelity relied only upon the statements and conduct of Mr. Logue at the time the Indemnity Agreement was signed. Because Mr. Logue's statements and other conduct were unsupported by any manifestations traceable to the Movants, they cannot give rise to apparent authority. "The authority of an agent is not 'apparent' merely because it looks so to the person with whom he deals, but rather it is the principal who must cause third parties to believe that the agent is clothed with apparent authority." *Burdick*, 345 P.3d at 539. Fidelity has not pointed to any evidence even suggesting that any of the Movants made any manifestations to Fidelity that Mr. Logue was authorized to sign the Indemnity Agreement on behalf of any of them.[21]

> C.      The Barcelona Motion

Co-Defendant Barcelona joined in the Movants' motions to dismiss, or alternatively for summary judgment. Unlike the Movants, Barcelona was set up as a sole-member, manager-managed LLC. Barcelona's sole member was Benjamin Logue. Benjamin Logue was also appointed as Barcelona's initial manager and continued as the manager at the time the Indemnity

---

[20] To the extent that Fidelity relied on the Operating Agreements, it would have to rely on the entirety of those Agreements, including the fact that they provide that (1) Mr. Logue is not the Managing Member of any of the Movants, (2) each of the Movants is a single purpose entity with no relationship to the Plaza Development, and (3) the authority of the managing member is subject to restrictions.

[21] The court notes that to the extent that Fidelity's written Rule 56(d) motion seeks discovery regarding facts related to its apparent authority argument, further discovery would not uncover any facts of which Fidelity is not already aware. If any representations were made by the Movants to Fidelity, Fidelity would necessarily have been aware of them.

Agreement was signed. As a sole-member, manager-managed LLC, Barcelona has no "Managing Member," only a Member and a Manager. Barcelona argues that because it was set up as a manager-managed LLC and not a member-managed LLC, Mr. Logue's signature as the "Managing Member" was not effective. Specifically, under its operating agreement a "Member" had no managerial authority and was expressly prohibited from executing documents on behalf of Barcelona without prior written consent of the "Manager." Barcelona also contends that the signing of the Indemnity Agreement was not consistent with its stated purpose "to engage in the business of owning, operating, managing, developing, and selling real property, and to conduct such other business as is designated by [its] Manager."

Fidelity echoes the same arguments it made in response to the Movants' motions. First, Fidelity argues that it relied on Mr. Logue's authority as Barcelona's Manager and sole Member, and that no other person could have signed on behalf of Barcelona. Fidelity also contends that summary judgment would be inappropriate because the reasonableness of its reliance on the representations made in the Barcelona Resolution and Indemnity Agreement is a question of fact. Fidelity also argues that Mr. Logue's actions bind Barcelona under Utah Code § 48-2C-802. Finally, Fidelity makes an apparent authority argument.

Although Mr. Logue was the sole Member and also the Manager of Barcelona, there was no "Managing Member." In fact, Barcelona's Operating Agreement made clear that a member did not have authority to execute documents on its behalf—its Member could only participate in managerial duties (such as executing documents) if the Member had prior written consent from the Manager. But Mr. Logue had no such consent to sign the Indemnity Agreement.[22]

---

[22] Even if the Barcelona Resolution could be construed as written consent from the Manager, that Resolution suffers from the same fatal flaw as the Resolutions for each of the Movants, including the fact that the Resolution was not adopted at a special meeting of all the members.

Fidelity repeats its argument that its misguided reliance on facts and circumstances somehow creates actual authority and that the question of whether its reliance was reasonable precludes summary judgment. However, as discussed previously, a contracting parties' reliance is irrelevant when analyzing whether an agent has actual authority. Reliance is relevant to Fidelity's apparent authority argument, but as with the apparent authority argument made in opposition to the Movants' motions, Fidelity has failed to produce any evidence that Barcelona made any manifestations on which Fidelity relied. Fidelity argues that, from its perspective, Barcelona created an appearance that Mr. Logue had authority to bind Barcelona by identifying him as the Manager of Barcelona in its Articles of Organization, describing the purpose of Barcelona in the Articles of Organization, and sending Mr. Logue to Fidelity to request the bonds. However, Fidelity has conceded that at the time Mr. Logue executed the Indemnity Agreement, it did not consult Barcelona's Articles of Organization or the Operating Agreement. Thus, Fidelity cannot now claim that it relied on the Articles of Organization as a manifestation from Barcelona that Mr. Logue had authority to execute the Indemnity Agreement on its behalf. Had Fidelity consulted the Articles of Organization or the Operating Agreement at the time the Indemnity Agreement was executed, it would have seen that Barcelona had no "Managing Member," that Mr. Logue, as Barcelona's Manager, was the person authorized to sign on behalf of Barcelona, and that Barcelona's stated purpose did not include guaranteeing the bonds for a project in which it had no interest. In short, Mr. Logue was not authorized to execute the Indemnity Agreement on behalf of Barcelona.

## CONCLUSION

Neither any of the Movants nor Barcelona is bound by the Indemnity Agreement. Although Mr. Logue purported to sign as the "Managing Member" of each of these parties, it is undisputed that Mr. Logue was not the Managing Member of any of them, and that the Movants

and Barcelona had no financial interest whatsoever in the Plaza Development or in the issuance of bonds to the developer of the Plaza Development. Fidelity failed to conduct any due diligence to ascertain who was properly authorized to execute a document like the Indemnity Agreement on behalf of the Movants and Barcelona, and failed to follow the requisite formalities in obtaining authorization. Mr. Logue was not authorized to execute the Indemnity Agreement on behalf of any of the Movants or Barcelona. Accordingly, the court hereby ORDERS that:

1.  Fidelity's Rule 56(d) Motion (Dkt. 56) is DENIED.

2.  The Amberley Defendants' Motion (Dkt. 15) and the Joinder (Dkt. 27) are GRANTED.[23]

3.  Barcelona's Motion (Dkt. 35) is GRANTED.

4.  Fidelity's claims against Amberley Properties I, LLC, Amberley Properties II, LLC, Bracken Properties, L.L.C., Dundee Properties, L.L.C., Edinburgh Properties, L.L.C., Farquhar Properties, L.L.C., Glenfinnan Properties, L.L.C., Inverness Properties, L.L.C., Andalucia Properties, L.L.C., Jameson Commercial Properties, L.L.C., Jameson Properties, L.L.C., Kilmarnock Properties, L.L.C., McGregor Properties,

---

[23] The Amberley Defendants alternatively ask the court to dismiss Defendant Amberley Properties I, L.L.C. ("Amberley I"), because it is a non-existent entity. The Amberley Defendants concede that there is an entity named Amberley Properties, L.L.C., but that entity is not a signatory to the Indemnity Agreement. Fidelity responds that it would be improper to dismiss the claims against Amberley I under Fed. R. Civ. P. 21, which provides: "Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party." Fidelity further argues that it would be premature to make any order deleting Amberley I as a defendant and replacing it with Amberley Properties, L.L.C. because there are certain factual issues that first need to be resolved. Those factual issues include whether an entity named Amberley Properties I, L.L.C. actually exists or whether Amberley Properties I, L.L.C. was simply another name for Amberley Properties, L.L.C., used to distinguish between Amberley Properties, L.L.C., and Amberley Properties II, L.L.C. Because the court grants the Movants' motions for the reasons explained above, this alternative argument is moot.

L.L.C., Oban Properties, L.L.C., Portree Properties, L.L.C., Raasay Properties, L.L.C., and Barcelona Properties, L.L.C. are hereby DISMISSED WITH PREJUDICE

Signed March 2, 2017.

BY THE COURT

Jill N. Parrish
United States District Court Judge